J. S53042/17

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | No. 3835 EDA 2016 |
| | : | |
| FODAY F. KANU | : | |

Appeal from the PCRA Order, December 1, 2016,
in the Court of Common Pleas of Chester County
Criminal Division at No. CP-15-CR-0000834-2009

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| FODAY F. KANU, | : | No. 81 EDA 2017 |
| | : | |
| Appellant | : | |

Appeal from the PCRA Order, December 1, 2016,
in the Court of Common Pleas of Chester County
Criminal Division at No. CP-15-CR-0000834-2009

BEFORE: BENDER, P.J.E., OLSON, J., AND FORD ELLIOTT, P.J.E.

MEMORANDUM BY FORD ELLIOTT, P.J.E.: **FILED JUNE 06, 2018**

The Commonwealth appeals from the December 1, 2016 order that granted Foday F. Kanu's (hereinafter "Kanu") petition filed pursuant to the Post-Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546, and

ordered a new trial on all charges filed against appellant. Kanu cross

appeals. After careful review, we reverse in part and affirm in part.

The PCRA court set forth the following factual history:

> [The victim, H.K.,] is a native and citizen of the West African country of Sierra Leone. The national language is Krio. She was raised in a small village with her ten (10) siblings. It is a tribal community whereby conflict is first addressed by the immediate families of the parties involved, then the families' elders, and if it is still not resolved, then the "paramount chief" resolves the matter according to custom. It is customary for men to be allowed to marry multiple women, while women are married to only one man. In Sierra Leone there is no concept of rape. A woman is subservient to the man in all matters. It is customary to have the man marry the woman who is allegedly raped.

> Although it is rare for a woman to pursue an education, [H.K.] was allowed to attend school (provided by missionaries) while living at her village. She again continued her education in Freetown, the capitol of Sierra Leone, after moving there in 1991.

> Subsequently, she applied for "the lottery" and won a visa to come to and work in the United States. She eventually settled in West Chester and began working for Barclay Friends, an assisted living facility. Thereafter, [H.K.] obtained her certification as a nursing assistant and began attending the Center for Arts and Technology (CAT), at the Brandywine campus, Chester County, Pennsylvania, to obtain a Licensed Practical Nurse (LPN) degree.

> [H.K.] met [Kanu] in 2005 while working at Barclay Friends. [Kanu] is also a native of Sierra Leone. He and [H.K.] struck-up a friendship akin to brother and sister. Because of their brother/sister relationship, [H.K.] gave [Kanu] a key to her apartment. On two occasions, she loaned him money which he paid back. In late September of 2006, she loaned him

money to buy a car, which was not paid back. On October 9, 2006, there was an argument about when she would be paid back. This argument escalated into an alleged physical assault and rape. The next morning she sought medical treatment for injuries resulting from the alleged assault and rape. [H.K.] did not lodge a complaint with the Police. After the 2006 incident, [H.K.] testified [Kanu] warned her not to say anything to anyone or "something bad" would happen to her. She lived in fear that if she did anything she would be hurt more.

[H.K.] visited Africa in March of 2007 to attend her father's funeral. Upon her return to West Chester, [Kanu] would come to her apartment and request sex. Although it was not her desire to have sex with [Kanu], the tenor of her testimony indicated she acquiesced until April of 2007, at which time she refused and was allegedly beaten by [Kanu]. She then acquiesced again to having sex with [Kanu] due to her fear of being hurt.

[H.K.] decided to report [Kanu's] treatment so that the facts surrounding her eventual death would be known. Detective Stanley J. Billie (hereinafter "Detective Billie") took her complaint regarding the October, 2006 alleged rape on March 20, 2008. [H.K.] also sought a Protection From Abuse Order (hereinafter "PFA"). Subsequently, [Kanu] told her "she would lose her life." Due to her fear, she did not pursue a permanent PFA Order and withdrew her March 20, 2008 complaint.

On July 21, 2008, [Kanu] called [H.K.] and told her he was coming over to repay the car loan. She allowed him to enter her apartment at approximately 2:00 p.m. He did not have the money. They had an argument. [H.K.] left to go to her night class. She returned to her apartment after 11:00 p.m., at which time [Kanu] presented himself suddenly behind her. [Kanu] requested sex and [H.K.] refused. [Kanu] proceeded to assault her. He restrained her, placed a cloth in her mouth and pushed her onto the mattress in her bedroom.

She continued to struggle but stopped when she saw that [Kanu] had brought an eight (8) inch knife and placed it near where they were struggling. [H.K.] thought she was going "to lose [her] life. [She] thought this is the end of me."

[Kanu] continued to have sex with her. He ejaculated into a T-Shirt/vest.[Footnote 5, Footnote 6].

[H.K.] testified [Kanu] held her hands and pushed her into the bathroom and instructed her to take a shower. He then forced her to get re-dressed. She proceeded to the kitchen to finish preparing her native dish of hot cereal. A verbal argument ensued. [Kanu] rushed at her while she was holding the hot pot. In the struggle with [Kanu], hot cereal splashed on her arms, hands, neck and face. [Kanu] also suffered burns. [H.K.] tried to leave the apartment 4-5 times but was prevented by [appellant].[Footnote 8] [Kanu] struck [H.K.] and held her down. He placed a pillow(s) over her head to stifle her screams. She could not breathe and lost consciousness.[Footnote 9]

> [Footnote 5] [H.K.] placed the T-Shirt/vest in a plastic bag and hid it in her hamper. There was evidence presented by the Commonwealth that semen, found on [Exhibit] C-3, was from [Kanu], as confirmed by DNA testing.
>
> [Footnote 6] The testimony of what took place in the bedroom, as believed by the jury, supports a finding of rape and sexual assault.
>
> [Footnote 8] This testimony, as believed by the jury, supports a finding of false imprisonment.

[Footnote 9] This testimony, as believed by the jury, supports a finding of aggravated assault.

One of the officers initially on the scene was Corporal Thomas Gotthold (hereinafter "Corporal Gotthold"). He observed [H.K.] on the floor. She was hysterical and unresponsive to questions. Two unidentified females, one unidentified male and [Kanu] were present at the time of his arrival. These individuals, along with [Kanu] were very calm and "seemed to be uninterested. Almost like it was normal what had happened." Corporal Gotthold believed the 911 call to which he was responding was made by [Kanu].

[H.K.] was treated for her burns at Chester County Hospital and then transported to Brandywine Hospital by Officer Pamela McClaren (hereinafter "Officer McClaren") for additional treatment not related to her burns. At Brandywine Hospital, [H.K.] was examined by a SANE nurse, Hazel Stanton (hereinafter "Nurse Stanton"), who took saliva, hair, nail scrapings etc. as part of a rape kit.

[H.K.] gave a statement, as to the events of July 22, 2008, to Detective Billie later that day. She told him about the T-Shirt/vest and Officer McClaren escorted her back to her apartment to retrieve it. Detective Billie called [Kanu] later that same day and:

> "asked him to come in and speak to [him] about what happened so [he] could get [Kanu's] version of events . . . . [Kanu] told [Detective Billie] he would not [come to the police station]. [Kanu] said that he did not have sex with [H.K.] last night. [Kanu] then became irate, sounded angry, [began] shouting on the phone, 'I am her boyfriend, I can do what I want.'"

Thereafter, a warrant was issued for the arrest of [Kanu]. An arrest was made on August 1, 2008 and

a sample of [Kanu's] DNA was taken. A preliminary hearing was scheduled for August 19, 2008.

After the arrest, between July 22, 2008 and August 19, 2008, [H.K.] began receiving calls from Africa; first, from [Kanu's] family in Africa who tried to convince her not to proceed, and then from her own family in Africa who were concerned she would die if she proceeded with charges against [Kanu].[Footnote 11] A village elder flew from Africa to meet with her, and the Assistant District Attorney, to convince her she should drop the charges and marry [Kanu].[Footnote 12] [H.K.] did not appear for the preliminary hearing because of the threats against her. The charges against [Kanu] were withdrawn.

> [Footnote 11] Her mother told her voodoo and black magic would be used against her and her family. This terrified [H.K.].

> [Footnote 12] This testimony, as believed by the jury, supports the first count of intimidation for the period of July 22, 2008 through August 19, 2008.

[H.K.] reinstated her charges on January 21, 2009.[Footnote 13] She was contacted by a friend of her family. He requested she attend a "family meeting[."] [H.K.] attended the meeting. Her Pastor, Diedone Onzo Diela, accompanied her. There were about 12-15 persons at the meeting. [Kanu] appeared at the meeting. [Kanu] called her later that same night and warned her he would kill her if she proceeded.[Footnote 14] [H.K.] did not withdraw her charges.

> [Footnote 13] [H.K.] testified that, through counseling, medical treatment and the assistance of community support from her Pastor, she desired to proceed with charges against [Kanu].

> [Footnote 14] This testimony, as believed by the jury, supports the second count of intimidation for January 27, 2009.

It was further established, by stipulation of both counsels before the jury, that "Ibrahim Jalloh"[Footnote 15] would testify he has spoken with members of the community who know [Kanu] and [Kanu] has a reputation for a peaceful and law-abiding nature.[]

> [Footnote 15] This individual is a friend of [Kanu]. There was also testimony from [H.K.] that this witness paid her $3,000 on behalf of [Kanu] for the car loan.

PCRA court opinion, 12/1/16 at 3-11 (citations to notes of testimony and trial exhibits omitted; footnotes 1, 2, 3, 4, 7, & 10 omitted; some brackets in original).

The PCRA court set forth the following procedural history:

> On October 16, 2009, following a jury trial, [Kanu] was found guilty of Rape, 18 Pa.C.S.A. § 3121(a)(1), Sexual Assault, 18 Pa.C.S.A. § 3124.1[,] False Imprisonment, 18 Pa.C.S.A. § 2903, Aggravated Assault, 18 Pa.C.S.A. § 2702(a)(1) and two counts of Intimidation of a Witness/Victim, 18 Pa.C.S.A. § 4952(a)(1). On March 11, 2010, we sentenced [Kanu] to an aggregate term of 16 to 32 years' imprisonment. Post sentence motions were filed and denied. [Kanu] did not file a direct appeal.

> On June 6, 2011, [Kanu] filed his first PCRA petition and PCRA counsel was appointed. After review by the Commonwealth, it was determined that [Kanu's] counsel had failed to file a direct appeal from the judgment of sentence. On June 20, 2011, without Commonwealth objection, this court granted [Kanu's] PCRA petition seeking permission to file a

direct appeal ***nunc pro tunc***. In a Memorandum filed on August 22, 2012, the Superior Court affirmed judgment of sentence. ***See*** Memorandum Opinion at 1773 EDA 2011. On September 21, 2012, [Kanu] petitioned the Pennsylvania Supreme Court for allowance of appeal, which that Court denied on June [11], 2013.[1]

[Kanu] filed the instant ***pro se*** PCRA on April 7, 2014. The content and format of the petition suggests that he had the assistance of unidentified counsel, whether attorney or otherwise, in preparing the petition. We appointed the Public Defender of Chester County PCRA counsel, who in the person of Maria Heller, Esquire on August 22, 2014 filed an "adoption of [Kanu's] ***pro se*** petition, adding three potential witnesses to those identified in the petition for purposes of an evidentiary hearing. [Kanu] attached 34 "Character Witness Certifications" to his PCRA petition. The Commonwealth filed an Answer to the Petition on December 29, 2014.

We conducted an evidentiary hearing on January 28, 2015 at which testimony was taken. At the evidentiary hearing, fourteen fact witnesses testified, including 12 so-called character witnesses, [Kanu] and trial counsel, Jacob Gurwitz, Esquire ("Trial Counsel"). PCRA counsel filed a memorandum of law in support of the Petition on April 17, 2015. The Commonwealth filed its memorandum of law in opposition on June 9, 2015.

***Id.*** at 1-2 (footnotes omitted; some brackets in original).

On December 1, 2016, the PRCA court granted, in part, Kanu's PCRA petition and ordered a new trial on all charges. The Commonwealth filed a notice of appeal to this court on December 14, 2016. On December 15, 2016, the PCRA court ordered the Commonwealth to file a concise statement

---

[1] ***Commonwealth v. Kanu***, 68 A.3d 907 (Pa. 2013).

of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Kanu filed a notice of cross-appeal with this court on December 23, 2016, and the PCRA court ordered Kanu to file a concise statement of errors complained of on appeal on January 3, 2017. Both parties timely complied with the court's orders, and on January 25, 2017, the PCRA court filed an opinion pursuant to Pa.R.A.P. 1925(a), in which it relied upon its December 1, 2016 opinion and order.

The Commonwealth raises the following issue for our review:

> Whether the PCRA court committed an error of law by granting the PCRA petition and a new trial based on the alleged ineffectiveness of counsel[?]

Commonwealth's brief at 4 (capitalization omitted).

On cross-appeal, Kanu raises the following issues for our review:

> 1. Did the PCRA court err in finding that trial counsel, Mr. Jacob Gurwitz, Esq., was not ineffective in failing to properly object to the inadmissible hearsay testimony offered by West Chester Police Officer Pamela McClaren? In addition, did the PCRA court err in finding that appellate counsel, Mr. Jack McMahon, Esq., was not ineffective for failing to raise this issue on direct appeal?
>
> 2. Did the PCRA court err in finding that trial counsel, Mr. Jacob Gurwitz, Esq., was not ineffective for his failure to object to West Chester Police Detective Stanley Billie's inadmissible hearsay testimony which did not fit or exceeded the "excited utterance" and "prompt complaint" exceptions?
>
> 3. Did the PCRA court err in finding that trial counsel, Mr. Jacob Gurwitz, Esq., was not

> ineffective for his failure to object to Commonwealth's closing argument where prosecution argued that a prior rape was "intent" for the charge being tried when the trial court had admitted the prior rape solely as evidence to show the background of the case?

Kanu's brief at 4.

Appeals following the granting of a PCRA petition are subject to the following standard of review:

> Our standard of review from the grant or denial of post-conviction relief is limited to examining whether the PCRA court's determination is supported by the evidence of record and whether it is free of legal error. **Commonwealth v. Morales**, 701 A.2d 516, 520 (Pa. 1997). We will not disturb findings that are supported by the record. **Commonwealth v. Yager**, 685 A.2d 1000, 1003 (Pa.Super. 1996) (**en banc**).

**Commonwealth v. Ousley**, 21 A.3d 1238, 1242 (Pa.Super. 2011), **appeal denied**, 30 A.3d 487 (Pa. 2011).

> To be entitled to relief on an ineffective assistance claim, a PCRA petitioner must establish: (1) the underlying claim has arguable merit; (2) no reasonable basis existed for counsel's action or failure to act; and (3) he suffered prejudice as a result of counsel's error, with prejudice measured by whether there is a reasonable probability that the result of the proceeding would have been different. **Commonwealth v. Chmiel**, 30 A.3d 1111, 1127 (Pa. 2011) (employing ineffective assistance of counsel test from **Commonwealth v. Pierce**, 527 A.2d 973, 975-976 (Pa. 1987).[Footnote 5] Counsel is presumed to have rendered effective assistance. **Commonwealth v. Ali**, 10 A.3d 282, 291 (Pa. 2010). Additionally, counsel cannot be deemed ineffective for failing to raise a meritless claim. **Commonwealth v. Jones**, 912 A.2d 268, 278 (Pa.

2006). Finally, because a PCRA petitioner must establish all the *Pierce* prongs to be entitled to relief, we are not required to analyze the elements of an ineffective assistance claim in any specific order; thus, if a claim fails under any required element, we may dismiss the claim on that basis. *Ali*, 10 A.3d at 291.

> [Footnote 5] *Pierce* reiterates the preexisting three-prong test for ineffective assistance of counsel in Pennsylvania and holds it to be consistent with the two-prong performance and prejudice test in *Strickland v. Washington*, 466 U.S. 668 (1984). *Pierce*, 527 A.2d 976-977.

*Commonwealth v. Trieber*, 121 A.3d 435, 445 (Pa. 2015).

> Generally, counsel's assistance is deemed constitutionally effective if he chose a particular course of conduct that had some reasonable basis designed to effectuate his client's interests. Where matters of strategy and tactics are concerned, a finding that a chosen strategy lacked a reasonable basis is not warranted unless it can be concluded that an alternative not chosen offered a potential for success substantially greater than the course actually pursued.

*Commonwealth v. Spotz*, 84 A.3d 294, 311-312 (Pa. 2014) (citations and quotations omitted).

The Commonwealth's sole issue on appeal is whether the PCRA court erred in finding that Attorney Gurwitz provided ineffective assistance of counsel by failing to call Magnus Stevens (hereinafter "Stevens"), Mohammed Koroma (hereinafter "Koroma"), and Alie Kargbo (hereinafter "Kargbo") as fact and/or character witnesses on Kanu's behalf at trial. The

PCRA court specifically stated that because H.K. "denied that she was engaged[,] at any time[,] in a romantic relationship with [Kanu, it] was thus critically important to the defense to attempt to establish the contrary, especially since the Commonwealth was permitted to introduce [Pa.R.E.] 404(b)(2) evidence about the prior relationship of [Kanu] from [H.K.'s] perspective." (PCRA court opinion, 12/1/16 at 34.) The PCRA court further stated that fact testimony from Stevens, Koroma, and Kargbo, "if believed by the jury, would have cast doubt on [H.K.'s] testimony in this respect, an issue at the crux of the case." (*Id.*) Additionally, the PCRA court found that Stevens and Koroma would have been able to testify as to Kanu's reputation within the community for peacefulness and non-violence. (*Id.* at 35.)

When evaluating whether counsel was ineffective for failing to call a potential witness, we are bound by the following standard:

> When raising a failure to call a potential witness claim, the PCRA petitioner satisfies the performance and prejudice requirements of the *Strickland* test by establishing that:
>
> > (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the witness; and (4) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial.
>
> *Commonwealth v. Washington*, 592 Pa. 698, 927 A.2d 586, 599 (2007). To demonstrate *Strickland* prejudice, the PCRA petitioner "must show how the

uncalled witnesses' testimony would have been beneficial under the circumstances of the case." *Commonwealth v. Gibson*, 597 Pa. 402, 951 A.2d 1110, 1134 (2008); *see also Commonwealth v. Chmiel*, 585 Pa. 547, 889 A.2d 501, 546 (2005) ("Trial counsel's failure to call a particular witness does not constitute ineffective assistance without some showing that the absent witness's testimony would have been beneficial or helpful in establishing the asserted defense.").

*Commonwealth v. Johnson*, 966 A.2d 523, 536 (Pa. 2009).

In *Commonwealth v. Hull*, 982 A.2d 1020 (Pa.Super. 2009), we considered whether a trial counsel's failure to investigate potential character witnesses constituted ineffective assistance of counsel.

If we conclude that the particular course chosen by counsel had some reasonable basis, our inquiry ceases and counsel's assistance is deemed effective." *Weiss*, 606 A.2d at 441-442; *see also Commonwealth v. Blount*, 647 A.2d 199, 207 (Pa. 1994) ("[D]efense counsel's decision was not a tactical one made after weighing all of the alternatives, but was based on the fact that he had failed to interview and prepare potential character witnesses and consult with his client thereto. These failures by counsel were precipitated by defense counsel's perception that familial character witnesses were *per se* worthless." (quotation omitted)). "The test is **not** whether other alternatives were more reasonable, employing a hindsight evaluation of the record. Although weigh the alternatives we must, the balance tips in favor of a finding of effective assistance as soon as it is determined that trial counsel's decisions had any reasonable basis." *Blount*, 647 A.2d at 207 (quoting *Commonwealth ex rel. Washington v. Maroney*, 235 A.2d 349, 352 (Pa. 1967)). Counsel has a reasonable, strategic basis for not calling character witnesses if he has a legitimate reason to believe that the Commonwealth would cross-examine the witnesses

> concerning bad-character evidence. ***See Commonwealth v. Van Horn***, 797 A.2d 983, 988 (Pa.Super. 2002) (finding counsel's strategy not to call client's relatives as character witnesses reasonable because of client's prior convictions of burglary and statutory rape) (citing ***Commonwealth v. Morales***, 701 A.2d 516 (Pa. 1997)).

***Hull***, 982 A.2d at 1023.

During the trial, the Commonwealth was prepared to introduce expert testimony pertaining to the cultural differences between the laws of Sierra Leone and the laws of the United States regarding sexual offenses. The trial court restricted to rebuttal the Commonwealth's use of expert testimony pertaining to Sierra Leonean culture in the event that testimony elicited from defense witnesses pertaining to Sierra Leonean culture necessitated expert testimony.

Attorney Gurwitz testified that he was reluctant to call any character witnesses after Amara Conteh's (hereinafter "Conteh") cross-examination by the Commonwealth at trial. (Notes of testimony, 1/28/15 at 229.) Specifically, Attorney Gurwitz stated that the Commonwealth was asking Conteh questions about the cultural differences between the United States and Sierra Leone in an effort to call the Commonwealth's expert on rebuttal. (***Id.***)

During cross-examination, Conteh admitted that he was not familiar with the concept of rape.

Q. Mr. Conteh, you knew that the defendant was arrested for rape and aggravated assault and other charges; right?

A. Excuse me, why you bring about rape? I don't know what you're talking about rape.

Q. Do you know what the word rape means?

A. No.

Q. You never heard the word rape before?

A. I don't know what you mean by rape. You try to specify it for me.

Q. Okay, rape is force or threat of force to engage in sexual intercourse. Do you know what that means?

A. That was just explained to me.

Q. I just explained to you. Had you heard that before?

A. (The witness shook his head in the negative.)

. . . .

Q. Growing up in Africa, you've never heard the word rape?

A. Yeah, I don't know that word.

Q. You don't know what that is?

A. No.

Q. When I just explained to you the definition of rape, do you understand what that means?

A. Yes, now you explained to me. Growing up in Africa, I don't know about that one. I never heard about that.

Q.  You never heard about rape in Africa?

A.  (The witness shook his head in the negative.)

Notes of testimony, 10/16/09 at 39-41.

In order to determine whether Attorney Gurwitz's failure to call Stevens, Koroma, and Kargbo as character and/or fact witnesses based on his apprehension of opening the door as to permit the Commonwealth's expert to testify on rebuttal, we must first look to the differences in how sexual offenses are addressed in the United States and Sierra Leone.  As noted by the PCRA court, there is no concept of rape in Sierra Leone and that it is customary for the man to marry the woman who he allegedly raped.  (PCRA court opinion, 12/1/16 at 3.)  The PCRA court also noted that women are subservient to men in all matters.  (*Id.*)

Moreover, during trial, West Chester Police Detective Stanley J. Billie testified that when he called Kanu to ask if Kanu would be willing to speak with the police to obtain Kanu's version of the events the previous night, Kanu refused to speak with police and stated, "I am [H.K.'s] boyfriend, I can do what I want."  (Notes of testimony, 10/15/09 at 57.)  After making that statement, Kanu immediately hung up the phone.  (*Id.* at 58.)

Additionally, the facts established that once the accusations were made against Kanu, H.K. was subject to cultural pressure from her village elder in Africa and her own family to drop the charges.

While winnowing out many of the proposed character witnesses, the PCRA court placed great weight on three in particular, and we will examine each in turn.

**Magnus Stevens**

We shall first analyze Stevens' potential testimony.[2]  In its opinion, the PCRA court found Attorney Gurwitz to be ineffective for failing to call Stevens as a fact and character witness.  Specifically, the PCRA court stated that "had Stevens been thoroughly interviewed by trial counsel, [Kanu] would have had the benefit of valuable evidence questioning [H.K.'s] credibility, specifically casting doubt as to whether a rape had occurred." (PCRA court opinion, 12/1/16 at 32.)  Stevens also offered testimony in which he indicated that he had not "heard a bad reputation for [Kanu] ever in any community back home and [in Chester County.]"  (Notes of testimony, 1/28/15 at 118.)  Stevens further testified that to him, Kanu's "reputation has been very much positive in the community and he has been nonviolent.  I have not heard anything regarding violence ever."  (***Id.*** at

---

[2] To prevail on an ineffective assistance of counsel claim for failing to call a witness, a PCRA petition must establish by a preponderance of the evidence that the witness existed, was available and willing to testify for the defense, and that counsel knew, or should have known, of the existence of the witness.  ***Commonwealth v. Matias***, 63 A.3d 807, 810-811 (Pa.Super. 2013), ***appeal denied***, 74 A.3d 1030 (Pa. 2013), citing ***Commonwealth v. Sneed***, 45 A.3d 1008-1009 (Pa. 2012).  Here, the record reflects that Kanu has met these four requirements pertaining to Stevens.

119.) The PCRA court made a specific finding that Stevens' testimony at the PCRA hearing was credible. (PCRA court opinion, 12/1/16 at 32.)

Nevertheless, we find it abundantly clear that Attorney Gurwitz had a reasonable basis not to call Stevens to testify as a character witness at trial. Kanu failed to establish that Stevens' potential testimony would not have opened the door for the Commonwealth to call its cultural expert on rebuttal. Indeed, the record does not reflect that Stevens possessed an understanding of the cultural differences between the United States and Sierra Leone— particularly with how sexually based offenses are addressed. Clearly, the record reflects distinct differences between the community standards for sexual violence in the United States and Sierra Leone. Stevens' testimony would have opened the door for the Commonwealth to establish those differences. Accordingly, in light of Conteh's cross-examination, Attorney Gurwitz had a reasonable basis for not calling Stevens to testify.

As a fact witness, Stevens arrived after the incident in question, and was one of the people in H.K.'s apartment when the police arrived. Based on our review of the record, we fail to see how Stevens' testimony as to the factual issues in this case would have affected the outcome of the trial. Accordingly, Kanu's claim as to Attorney Gurwitz's failure to call Stevens to testify must fail.

**Mohammed Koroma**

Kanu also avers that Attorney Gurwitz rendered ineffective assistance for failing to call Mohammed Koroma (hereinafter "Koroma") to testify at trial. Here, Kanu fails to establish that Koroma was available to testify for the defense. Indeed, Attorney Gurwitz testified that he expected Koroma to appear and testify on October 16, 2009. (Notes of testimony, 1/28/15 at 227.) The trial record reflects, however, that at the time Attorney Gurwitz was prepared to call witnesses for the defense, one of the witnesses had failed to appear. (**See** notes of testimony, 10/16/09 at 7-9.) The record further reflects that the trial court took a recess in order to give the witness a chance to appear. (**Id.** at 8.) The trial record does not reflect that Koroma ever appeared. Accordingly, we find that Kanu failed to establish that Koroma was available to testify for the defense; therefore, his claim as it pertains to Koroma's potential testimony must fail.

Moreover, even if Koroma had been available to testify for the defense, the record reflects that his testimony also would have opened the door for the Commonwealth to call its expert witness on rebuttal. Indeed, H.K. testified that she told Koroma about the rape. ". . . I explained to him, and he was just laughing, what are you talking about rape, you are an African girl, you shouldn't talk about rape, you know in Africa you don't talk about rape, what are you talking about. And they just, like, they don't care

about it." (Notes of testimony, 10/14/09 at 115.)[3] Therefore, Attorney Gurwitz also had a reasonable basis for failing to call Koroma, even if he had been available to testify.

**Alie Kargbo**

Finally, Kanu contends that Attorney Gurwitz rendered ineffective assistance by failing to call Kargbo to testify for the defense. Citing to Kargbo's testimony at the PCRA hearing, the PCRA court concludes that had he been called, Kargbo was willing to testify that Kanu and H.K. had a romantic relationship. (**See** PCRA court opinion, 12/1/16 at 33.) The PCRA court further concluded that it could "perceive no reasonable basis grounded in trial strategy why trial counsel failed to call Kargbo as a trial witness." (**Id.**) We disagree.

Similar to our analysis of Attorney Gurwitz's decision to not call Stevens to testify, we find that Attorney Gurwitz's decision not to call Kargbo based in reasonable trial strategy, especially given the witness intimidation charges filed against Kanu. Kargbo testified that H.K. asked him in April or May of 2008—several months before the alleged rape—to mediate a conflict between herself and Kanu regarding money she was owed. (Notes of

---

[3] H.K. testified that Mohammed referred to Mohammed Karbo. (**Id.** at 115.) Later in her testimony, H.K. stated that it was Koroma that laughed at her after she told him about being raped. (**Id.** at 258.) Based on our review of the record, Karbo and Koroma appear to be the same person.

testimony, 1/28/15 at 158.)   Based on this knowledge, Attorney Gurwitz

testified as follows:

> I don't know about the rape part, the idea that you would have a third party say it's a boyfriend and girlfriend because they are having problems in April or May of 2008.  The idea of this was the part that really got to the heart and soul of the witness intimidation stuff.
>
> . . . .
>
> I had problems with the perceptibility to it. . . . And then you got [Conteh's] testimony.  At the point after the cross examination I felt my cross earlier of [H.K.] and the chief detective went very well.  I thought the Assistant D.A. Deb Ryan's cross-examination of [Conteh] in these cultural differences, I just got really bogged down and kept centering on that.
>
> And I was concerned after hearing that cross was Alie Kargbo, should he be present at the time.  I need him to show this April or May of 2008 meeting.  You got him to interact later.  There is an idea somehow that no one ever has telephone calls or phone calls between [Kanu] and [H.K.] after the fact.  And money exchanged after the fact is somehow going to be perceived as something.  That is going to be something that is taken at face value of a reconciliation or I'm paying for rent or paying for laptop as opposed to using it as hush money which is the interpretation that can be easily used or intimidation that I'm trying to scare you.  It cuts both ways.
>
> After the cross-examination of [Conteh,] I didn't perceive too much value in the April or May attempt at reconciliation.  I didn't understand the concept of why she is dumping hot oatmeal on [Kanu's] head to try to hurt him and be able to explain that.  They had a relationship.  They had problems.  And there

were people that they interacted with to resolve the problem.

. . . .

. . . This idea that there is this big witness intimidation circle or some language thing where in African culture is the thesis of this was essentially in Africa women are property and men can do whatever they wanted. And that attitude carried over when they came to the United States. That is the explanation for [H.K.] and for [Kanu] and the like. I believe it's completely bolstering. The D.A.'s office funded it and the [trial court] was entertaining the thought that the door could possibly be opened.

. . . .

. . . You have the fact witness but you have character witnesses and you get into what nonviolent means and law abiding when you have different laws and different cultural standards. And you have the possibility for prosecution to open the door and to have this expert witness come and testify and clarify cultural differences. That was a legitimate fear after the cross of [Conteh.]

*Id.* at 232-238.

Based on Attorney Gurwitz's testimony, we find that his decision not to call Kargbo was based in reasonable trial strategy, as he feared once again opening the door for the Commonwealth to call its expert witness on rebuttal. Accordingly, we find that the PCRA court erred when it determined that Attorney Gurwitz rendered ineffective assistance for failing to call Kargbo to testify. Any expert testimony on the sexual cultural differences between the United States and Sierra Leone would have been devastatingly prejudicial.

Having reversed the PCRA court's order granting Kanu's PCRA petition and ordering a new trial on all charges, we must now turn to the issues Kanu raises on cross-appeal. Kanu's first two issues pertain to whether the PCRA court erred when it determined that Attorney Gurwitz was not ineffective for failing to object to hearsay testimony offered by Officer McClaren and Detective Billie.

We shall first address Kanu's issue pertaining to Officer McClaren's testimony. Kanu contends that Attorney Gurwitz failed to "adequately object to [the] Commonwealth's proffered testimony," from Officer McClaren. (Kanu's brief at 17.) Specifically, Kanu argues that "[t]rial counsel should have responded to [the] Commonwealth's grounds for admitting Officer McClaren's testimony by prompting the [trial] court to apply the limits on prompt complaint testimony." (**Id.** at 24.)

This court has previously described the scope of prompt complaint testimony:

> Pennsylvania Rule of Evidence 613(c)(1) allows evidence of prior consistent statements to rebut an express or implied charge of "fabrication, bias, improper influence or motive, or faulty memory." In cases involving sexual assault, Rule 613 authorizes the Commonwealth to present evidence in its case-in-chief of a prompt complaint by the victim "because the alleged victim's testimony is automatically vulnerable to attack by the defendant as recent fabrication in the absence of evidence of hue and cry on her part. Pa.R.Evid. 613(c) (comment), citing **Commonwealth v. Freeman**, 441 A.2d 1327, 1331 (Pa.Super. 1982). "Evidence of a complaint of a sexual assault is 'competent

> evidence, properly admitted when limited to establish that a complaint was made and also to identify the occurrence complained of with the offense charged.'" ***Commonwealth v. Stohr***, 522 A.2d 589, 592-593 (Pa.Super. 1987) (***en banc***), quoting [***Freeman***, 441 A.2d at 1331].

***Commonwealth v. O'Drain***, 829 A.2d 316, 321-322 (Pa.Super. 2003), cited by ***Commonwealth v. Bryson***, 860 A.2d 1101, 1104 (Pa.Super. 2004) (***en banc***), ***appeal denied***, 875 A.2d 1072 (Pa. 2005).

Here, the testimony in question by Officer McClaren is as follows:

> She said that she was at home, and that Mr. Kanu had forced her to have sexual intercourse against her will; that the only reason she went along with it is he had a knife on his person and she was scared for her safety. And that during the assault, that he did not ejaculate inside of her but ejaculated on what she described as a vest. And after she was assaulted, he refused to let her call anybody and took her cell phone and forced her to take a shower also against her will.

Notes of testimony, 10/15/09 at 7.

Kanu argues that Officer McClaren's testimony was tantamount to a "recitation of the complainant's statement," going "beyond 'identifying the complaint and its nature,'" thus rendering the testimony inadmissible hearsay not subject to the prompt complaint exception. (Kanu's brief at 23.) We disagree.

Kanu relies on our supreme court's holding in ***Commonwealth v. Green***, 409 A.2d 371 (Pa. 1979). The testimony at issue in ***Green***, however, is distinguishable from Officer McClaren's testimony at issue here.

In **Green**, a detective taking the stand after the victim had testified, stated that the victim, "had not testified to anything different than what she had told him." **Id.** at 374. Our supreme court found that such a statement "clearly goes beyond identifying the complaint and its nature and is, therefore, not properly admissible under that principle." **Id.** at 374-375 (footnote omitted). To the contrary, in **Commonwealth v. Stohr**, 522 A.2d 589, 592 (Pa.Super. 1987), this court determined that testimony by a victim's mother corroborating "her daughter's statements concerning the assault and the identity of the defendant" was admissible under the prompt complaint exception to the rule against hearsay.

Here, Kanu fails to explain how Officer McClaren's testimony goes beyond identifying the complaint and its nature. Unlike the detective in **Green**, Officer McClaren does not provide an all-encompassing statement corroborating H.K.'s testimony; rather, Officer McClaren's testimony corroborates H.K.'s statements concerning the assault and the identity of the defendant. We therefore find that this claim is without merit.

Kanu forwards a layered claim of ineffective assistance of counsel in that he alleges that his counsel rendered ineffective assistance on direct appeal for failing to raise Officer McClaren's testimony as an issue on direct appeal. (Kanu's brief at 24.)

Here, Kanu failed to establish the three **Pierce** prongs pertaining to the assistance of his trial counsel in relation to Officer McClaren's testimony,

as the claim lacked arguable merit. Accordingly, Kanu's claim of ineffective assistance of appellate counsel must likewise fail, as counsel cannot be held to be ineffective for failing to pursue a meritless claim. ***See Commonwealth v. Baldwin***, 760 A.2d 883, 885 (Pa.Super. 2000), ***appeal denied***, 781 A.2d 138 (Pa. 2001), citing ***Commonwealth v. Wilson***, 672 A.2d 293, 298 (Pa. 1996), ***cert. denied***, 519 U.S. 951 (1996).

We now turn to Detective Billie's testimony. Kanu alleges that Attorney Gurwitz rendered ineffective assistance based on his failure to object to Detective Billie's "improper recitation of [H.K.'s] version of events. (Kanu's brief at 19.)

Detective Billie testified as follows:

> She told me that while she was at her apartment -- after returning home from school, she was cooking an African cereal on the stove and she had gone and she got changed. And she described to me the clothing that she was wearing, which she called it a lape, which she explained to me what it was. And she said when she returned to the kitchen area, Mr. Kanu was now in the apartment. He forced her into the bedroom where he threw her on the bed and forced her to engage in sexual intercourse.
>
> At that point, she said at one point she felt something on her back, and when she had an opportunity to look, she saw a large eight-inch knife, kitchen knife, on the floor. She became in fear for her life. She said he then ejaculated into what she called a vest, which later I learned what she called a vest was the white tank top T-shirt that we had secured as evidence.
>
> Following the sexual assault, he then forced her to take a shower, which she did, and she went and

> returned to the kitchen to tend to the African cereal that she was cooking.
>
> She told me at that point she told Mr. Kanu that she was going to call the police, and he became irate and he kind of approached her and at the same time lunged at her spilling the African cereal, the pot that she was holding, on her causing the burns on her facial area and her arms, both arms.
>
> She said she tried to get out of the apartment several times and was unable to do so. And she did not have a cell phone to call. At which time she said at some point there were multiple people in the apartment and somebody called 911. And that's when the police arrived and she was transported to the Chester County Hospital via an ambulance. Mr. Kanu was transported by I believe Corporal Gotthold from the West Chester Police Department to Chester County Hospital for the burns that he had on him.

Notes of testimony, 10/15/09 at 54-55.

After careful review of the record, we agree with the PCRA court's conclusion that Detective Billie's testimony was admissible under the prompt complaint exception to the rule against hearsay. Specifically, the PCRA court noted that "Detective Billie's testimony was abbreviated, and did not go into the detailed account of the rape which [H.K.] had earlier described to the jury in her trial testimony. [Detective] Billie's testimony did not fill in any blanks in [H.K.'s] description of the events of the evening of the rape." (PCRA court opinion, 12/1/16 at 42.)

In his third and final issue on cross-appeal, appellant contends that the PCRA court erred when it did not find Attorney Gurwitz ineffective for failing

to object to the "Commonwealth's closing argument where [it] argued that a prior rape was 'intent' for the charge being tried when the trial court had admitted the prior rape solely as evidence to show the background of the case[.]" (Kanu's brief at 4.) Specifically, Kanu argues that this omission on the part of Attorney Gurwitz denied him a fair trial. (***See id.*** at 25.) Put another way, Kanu appears to be raising a claim that Attorney Gurwitz failed to object to statements that constituted prosecutorial misconduct on the part of the Commonwealth during its closing statement.

Prosecutorial misconduct does not occur unless the jurors form a fixed bias and hostility toward the defendant based on the prosecutor's comments. ***Commonwealth v. Robinson***, 877 A.2d 433, 441 (Pa. 2005). When specifically considering a prosecutor's comments to a jury during closing arguments, this court has stated, "It is well settled that a prosecutor has considerable latitude during closing arguments and his arguments are fair if they are supported by the evidence or use inferences that can reasonably be derived from the evidence." ***Commonwealth v. Caldwell***, 117 A.3d 763, 774 (Pa.Super. 2015) (***en banc***) (citations omitted). This court further stated that any taint from a prosecutor's improper statements may be cured by a curative instruction to the jury, and that courts are compelled to consider "all surrounding circumstances before finding that curative instructions [are] insufficient and the extreme remedy of a mistrial is required." ***Id.*** (citations omitted). A jury is presumed to have followed

any instructions provided by the trial court. ***Commonwealth v. Elliott***, 80 A.3d 415, 445 (Pa. 2013), citing ***Commonwealth v. DeJesus***, 860 A.2d 102, 111 (Pa. 2004).

Here, Kanu alleges that Attorney Gurwitz should have objected to the following statement made by the Commonwealth during its closing statement to the jury:

> Next there's a charge of burglary. Burglary is the intent to commit a crime inside a property. So that when this defendant comes to [H.K.'s] property July 22nd at night, he gets into the apartment without her permission and his intent was to rape her.
>
> And how do we know that? We know what [H.K.] told you what his actions were, but you can also consider the other rapes that she talked about. Think about the rape from October of 2006. On that occasion, you heard two people come forward to testify as prompt complaint witnesses.

Notes of testimony, 10/16/09 at 134.

Kanu's argument relies upon Pennsylvania Rule of Evidence 105. Rule 105 states, in relevant part: "If the court admits evidence that is admissible against a party or for a purpose--but not against another party or for another purpose--the court, on timely request, must restrict the evidence to its proper scope and instruct the jury accordingly." Pa.R.E. 105. Kanu's reliance is misplaced.

The record reflects that the trial court provided an instruction to the jury pertaining to the prior rape:

> [i]n the context of this case, that kind of unrelated activity is offered to establish the background to and the development of and the history and existence of a relationship between the parties. So make sure that you do not fall into the error of believing that prior conduct that was described by [H.K.] is proof that the conduct was repeated in connection with the crime charged.

Notes of testimony, 10/15/09 at 51.

Kanu's argument implies that the Commonwealth referenced the alleged prior rape during its closing argument to show intent of repeating that conduct. "Where the act of rape was disputed entirely, the prejudice is clear as it adds impermissible evidence to the prosecution argument." (Kanu's brief at 27-28.) This claim is belied by the record. As noted above, the Commonwealth did not reference the alleged prior rape in connection with the rape charge's being considered by the jury; rather, the alleged prior rape was referenced in connection to the burglary charge's being considered by the jury. Taken in that context, the reference to the prior alleged rape is not being used to show intent to repeat the alleged conduct. Moreover, Kanu fails to prove by a preponderance of the evidence that the jury formed a fixed bias and hostility toward him as a result of the Commonwealth's closing statement. Accordingly, Kanu's claim lacks arguable merit.

Order reversed in part and affirmed in part. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>6/6/18</u>